# Exhibit A

**FILED DISTRICT COURT**
Third Judicial District

**JAN 2 8 2010**

SALT LAKE COUNTY

By_____
Deputy Clerk

DAVID M. BENNION (5664)
SCOTT S. BELL (10184)
PARSONS BEHLE & LATIMER
One Utah Center
201 South Main Street, Suite 1800
Post Office Box 45898
Salt Lake City, UT 84145-0898
Telephone: (801) 532-1234
Facsimile: (801) 536-6111

ERIC J. AMDURSKY (CA#180288) *(pro hac vice* application to be filed)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, California 94010
Telephone (650) 473-2600
Facsimile: (650) 473-2601
*Attorneys for Plaintiff Fusion Multisystems, Inc. d/b/a Fusion-io*

### IN THE THIRD JUDICIAL DISTRICT COURT
### SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| FUSION MULTISYSTEMS, INC., d/b/a FUSION-IO, a Nevada corporation,<br><br>          Plaintiff,<br><br>vs.<br><br>VIOLIN MEMORY, INC., a Delaware corporation, CHRIS BASILE, a New Jersey resident, INAURA, INC., a Delaware corporation, RODNEY RASMUSSEN, an individual, JEFF NEWMAN, an individual, JASON BLUM, an individual, CATALYST OPERATING LLC, a California limited liability company, IRON CAPITAL PARTNERS IV LLC, a California limited liability company, MIKE ANDERER, an individual, DIXON DOLL, JR., an individual, ERIC C. COOPER, an individual, BERT NORDBERG, an individual, MARK ROSENBLATT, an individual, DONPAUL C. STEPHENS, an individual, BING YEH, an | **COMPLAINT**<br><br>Case No. 100901551<br><br>Judge: Toomey |

individual, JON BENNETT, an individual, and
JOHN DOES 1-10,

     Defendants.

Plaintiff Fusion Multisystems, Inc., d/b/a Fusion-io ("Fusion-io"), by and through its

counsel and, in support of its claims for relief against defendants Violin Memory, Inc. ("Violin"),

Chris Basile, Inaura, Inc. ("Inaura"), Rodney Rasmussen ("Rasmussen"), Jeff Newman

("Newman"), Jason Blum ("Blum"), Catalyst Operating LLC ("Catalyst"), Iron Capital Partners

IV LLC ("Iron Capital"), Mike Anderer ("Anderer"), Dixon Doll, Jr. ("Doll"), Eric C. Cooper

("Cooper"), Bert Nordberg ("Nordberg"), Mark Rosenblatt ("Rosenblatt"), Donpaul C. Stephens

("Stephens"), Bing Yeh ("Yeh"), Jon Bennett ("Bennett"), and John Does 1-10, alleges as

follows:

## INTRODUCTION

    1.    Fusion-io brings this action to protect itself against a scheme orchestrated by its

former Chief Executive Officer, Donald G. Basile, to damage Fusion-io in the marketplace

through any means necessary, even if unlawful. Infuriated after Fusion-io chose not to condone

his misdeeds and terminated his employment for cause, Don Basile has embarked on a personal

crusade to spread falsehoods and damage Fusion-io's business. It is Don Basile's stated goal to

impose a "scorched earth" policy intended to impair Fusion-io's ability to continue its

remarkable growth, obtain investors and funding, and maintain customer relationships. The

defendants in this lawsuit have all participated in Don Basile's ill-fated and unlawful scheme.

    2.    Fusion-io has a federal lawsuit and an arbitration currently pending against Don

Basile where it has asserted its claims against him individually. For this reason, Fusion-io has

not joined Don Basile as a party in this case. Fusion-io is already aggressively pursuing its claims and defenses against Don Basile in these forums. A central issue in the case between Don Basile and Fusion-io is whether Fusion-io had cause to terminate Don Basile's employment. Fusion-io has multiple reasons that gave it more than adequate cause to fire Don Basile. Indeed, those reasons screamed for termination for cause. For instance, Don Basile engaged in a romantic relationship with a 22-year-old administrative assistant, then gave her a promotion to a position for which she was not qualified. He also gave her a pay raise and stock options, and began taking her with him on travel around the world to meet with customers and investors. In other documented instances, Don Basile sexually harassed other female Fusion-io employees, threatened those who would report his misdeeds, and engaged in numerous other acts that unequivocally supported his termination for cause.

3.     Within the past week, Don Basile has made one of his most audacious moves yet. Don Basile, Chris Basile (Don's brother, who is an attorney), and Violin arranged for the transfer of cash and Violin stock worth approximately $3 million to purchase the rights to the intellectual property of Inaura, a dormant company. Don Basile learned during his time as Fusion-io CEO that the predecessor to Inaura, a bankrupt company called Realm Systems, Inc. ("Realm"), had made inquiries to Fusion-io concerning provisional patents of Realm that were subsequently abandoned and expired. Don Basile also learned that the inquiries had no merit and that Inaura's predecessor had entered into a Settlement and Release Agreement in which it voluntarily relinquished any potential claims it had against David Flynn, the inventor of Fusion-io's technology, and Fusion-io. Realm also sold to Fusion-io certain computer equipment and other

physical assets. While he was CEO of Fusion-io, Don Basile represented and warranted to customers and investors that Fusion-io properly owns its intellectual property.

4.    Nevertheless, Don Basile and some defendants in this case arranged for the payment of millions of dollars to purchase rights to Inaura's intellectual property. Upon information and belief, the purpose of the transaction is to harass Fusion-io, spread falsehoods in the marketplace, and initiate groundless litigation. This conduct follows the pattern of Don Basile's behavior since Fusion-io terminated his employment.

5.    Fusion-io seeks to protect its confidential, proprietary, and trade secret information and materials from further attack by Basile and his cohorts and to prevent further acts of unfair competition by Violin, a direct competitor of Fusion-io. Fusion-io also seeks to prevent Chris Basile from carrying out his brother's bidding in attempting to maliciously damage Fusion-io's customer relationships and its reputation through his underhanded agreements and dealings with Inaura and Rasmussen.

6.    Fusion-io is a relatively small but rapidly growing start-up company that develops technology in a marketplace that many pundits expect will soon be worth in excess $10 billion: solid state storage ("SSS") products for use in computer servers and high-end personal computers. Fusion-io's management team includes Chief Scientist Steve Wozniak (who, along with Steve Jobs, was one of the co-founders of Apple), and its strategic partners are most of the world's largest computer manufacturers and its customer base includes many Global 2000 companies.

7.    Violin is an older company that historically focused on dynamic random access memory ("DRAM") products. In the last year, many companies have pushed for SSS products

4

like those made by Fusion-io because it has 100 times the capacity density of DRAM and 10 times the capacity per dollar of DRAM. In order to survive, therefore, Violin recently shifted its business into SSS technology. The change was so fundamental that Violin even considered changing the name of its company because its historic DRAM business was "closing doors" to the company.

8.     Central to Violin's transformation from a DRAM vendor to an SSS developer was its hiring of Don Basile as its Chief Executive Officer. Don Basile was, until February 23, 2009, the CEO and Chairman of Fusion-io. The morning after his employment with Fusion-io was terminated for cause, Don Basile (who had no other experience with SSS products or companies before running Fusion-io) reached out to Violin in an effort to retaliate against Fusion-io and become Violin's CEO. He immediately reviewed and commented on Violin's business plans while negotiating his compensation, using confidential knowledge gained while CEO of Fusion-io to give Violin a unique competitive advantage.

9.     Violin and Don Basile unquestionably knew what they were doing was wrong. When Don Basile became Violin's CEO, they kept it a secret for five months. Not only was there no announcement of Don Basile's hiring, but Violin also went to great lengths to ensure the hire was not publicly disclosed. In the interim, Blum and Iron Capital publicly announced that Don Basile was working for Iron Capital, a company that had publicly touted its previous investment in Fusion-io but secretly invested in Violin at about the same time Don Basile became Violin's CEO. Violin continued to employ Don Basile as its CEO even after the United States District Court for the District of Utah (where proceedings between Fusion-io and Don

5

Basile are taking place) ordered that "Basile shall not discuss or otherwise provide services related to Fusion-io to Violin Memory or any other direct competitor of Fusion-io."

10.    Don Basile continued to use the same laptop computer he used as Fusion-io's CEO, and which contained all of his e-mails as Fusion-io's CEO and other Fusion-io confidential and proprietary information, to perform services as Violin's CEO. Indeed, Don Basile ignored several written and oral requests to return all Fusion-io documents, emails and property (including but not limited to a prototype ioSAN device), which ultimately forced Fusion-io to file an action for a preliminary injunction against Basile in Utah federal district court. Even after the federal court entered an order prohibiting Don Basile from, among other things, soliciting Fusion-io's customers, using Fusion-io's confidential information, and discussing or providing any services related to Fusion-io to Violin's benefit, Basile brazenly continued his vendetta against Fusion-io in violation of the court order.

11.    Don Basile's attack on Fusion-io was not limited to working for a direct competitor and refusing to return Fusion-io's proprietary information and property. In the days shortly after the termination of his employment at Fusion-io, Don Basile also contacted Rasmussen, Anderer, and Inaura, a company that Don Basile knew, from his time as Fusion-io's CEO, had a baseless potential claim regarding the ownership of Fusion-io's intellectual property. Don Basile also knew, from his time as Fusion-io's CEO, that Inaura's predecessor, Realm, had entered into a Settlement and Release Agreement in which it voluntarily relinquished any potential claims it had against David Flynn, the inventor of Fusion-io's technology, and Fusion-io.

6

12.    Don Basile only knew about this company and its spurious claims due to his work as Fusion-io's CEO and Chairman.  Upon information and belief, Don Basile persuaded Rasmussen and Anderer, board members and investors in Inaura, to allow him to compare Inaura's intellectual property with Fusion-io's intellectual property.  Rasmussen and Anderer aided and participated in Don Basile's scheme despite their knowledge of Don Basile's contractual confidentiality obligations to Fusion-io.  As a result of Don Basile's collusion with Rasmussen and then Anderer, within the last week, Inaura, Rasmussen, and Anderer finalized a transaction in which Chris Basile, with Violin's assistance, acted as front man to purchase a license to Inaura's intellectual property either on behalf of himself or an entity that Chris Basile owns, operates, or controls.

13.    Don Basile was acting for and on behalf of Violin as its CEO when he misused and disclosed Fusion-io's confidential information in order to broker and consummate the transaction with Inaura.  Moreover, Violin and its board members (Newman, Doll, Rosenblatt, Stephens, Bennett, Nordberg, Cooper, and Yeh) either knew or reasonably should have known about Basile's contractual and court-ordered obligations to Fusion-io.  Still, Violin and its board members sanctioned and actively participated in the transaction.  Indeed, upon information and belief, Violin created a new class of preferred stock to transfer to Inaura as part of the scheme to purchase rights to Inaura's intellectual property.  Upon information and belief, Violin and its board members, Chris Basile, Inaura, Rasmussen, Anderer, and Don Basile are now conspiring to embroil Fusion-io in expensive and baseless litigation.  Upon information and belief, Violin and its board members, Chris Basile, and Don Basile intend to disseminate false rumors and disinformation to damage Fusion-io's standing in the marketplace.

14.    Since hiring Don Basile as its CEO, Violin has also hired at least six other former Fusion-io employees, including Doll, the former head of Fusion-io's sales staff. Upon information and belief, Violin recruited some of these employees while they were still employed at Fusion-io and encouraged them to disclose confidential Fusion-io information. Doll and the other former Fusion-io employees have unique knowledge of Fusion-io's confidential information and customers (including knowledge of those customers' needs, contract terms, the products, and pricing they gained from their time at Fusion-io). This cadre of former Fusion-io employees has selectively solicited Fusion-io's customers to do business with Violin. The selling point in these solicitations has been Violin's representations to customers regarding their employees' prior experience at Fusion-io, which they have demonstrated by disclosing confidential information belonging to Fusion-io and the customers themselves.

15.    Through this action, Fusion-io seeks to put a stop to the unlawful attempts of Violin, Don Basile, Doll, and Chris Basile to replicate Fusion-io's successful business by misusing their inside knowledge of Fusion-io's business and confidential information. Fusion-io also seeks to prevent and/or unwind the transaction in which Rasmussen, Anderer, and Inaura licensed Inaura's intellectual property rights to Chris Basile or one of his affiliates.

### THE PARTIES

16.    Fusion-io is a Nevada corporation with its headquarters in Salt Lake City, Utah. Fusion-io maintains its principal place of business at 6350 South 3000 East 6th Floor, Salt Lake City, UT 84121.

17.    On information and belief, Violin is a Delaware corporation with its principal place of business at 33 Wood Avenue South 3rd Floor, Iselin, NJ 08830.

8

18.    On information and belief, Chris Basile is an individual who resides in the state of New Jersey.

19.    On information and belief, Inaura is a Delaware corporation with its principal place of business at 3976 South 2700 East, Salt Lake City, UT 84124.

20.    On information and belief, Rasmussen is an individual who resides in the state of Utah. He is a member of the Board of Directors of Inaura.

21.    On information and belief, Newman is an individual who resides in the state of California. He is the founder and principal owner of Catalyst. He is also a member of the Board of Directors of Violin.

22.    On information and belief, Blum is an individual who resides in the state of California. He is an executive of Iron Capital.

23.    Catalyst is a California limited liability company with its principal place of business at 25 Metro Drive, Suite 525, San Jose, CA 95110.

24.    Iron Capital is a California limited liability company with its principal place of business at 455 Market Street, Suite 550, San Francisco, CA 94105.

25.    On information and belief, Anderer is an individual who resides in the state of Utah. He is an investor in and member of the Board of Directors of Inaura. He is also fairly well known as an individual who uses intellectual property rights solely to institute lawsuits against other companies, rather than to make any productive use of the intellectual property.

26.    On information and belief, Doll is an individual who resides in the state of California. He is a personal friend of Don Basile who previously worked at Fusion-io and is currently an executive and member of the Board of Directors of Violin.

9

27.     Cooper is an individual whose residence is unknown at this time. He is a member of the Board of Directors of Violin.

28.     Nordberg is an individual whose residence is unknown at this time. He is a member of the Board of Directors of Violin.

29.     Rosenblatt is an individual whose residence is unknown at this time. He is a member of the Board of Directors of Violin.

30.     Stephens is an individual whose residence is unknown at this time. He is a member of the Board of Directors of Violin.

31.     Yeh is an individual whose residence is unknown at this time. He is a member of the Board of Directors of Violin.

32.     Bennett is an individual whose residence is unknown at this time. He is a member of the Board of Directors of Violin.

33.     John Does 1 through 10 are companies and/or entities affiliated with, owned, or controlled by Chris Basile, the identity of which is presently unknown. Upon information and belief, Chris Basile used one or more of these entities to purchase the intellectual property rights from Inaura. John Does 1 through 10 also include other members of Violin's Board of Directors who Fusion-io has yet to identify.

### JURISDICTION AND VENUE

34.     Subject matter jurisdiction for this action is proper under Utah Code Ann. § 78A-5-102(1).

35.    Venue for this action is proper in this Court under Utah Code Ann. §§ 78B-3-304 and 78B-3-307 because a substantial part of the events or omissions giving rise to the claims occurred within Utah.

36.    The Court has personal jurisdiction over all of the parties to the case. The Court has personal jurisdiction over the non-resident defendants, Violin, Chris Basile, Newman, Blum, Catalyst, Iron Capital, Doll, Cooper, Nordberg, Rosenblatt, Stephens, Yeh, and Bennett because they have transacted business in Utah, they have contracted to supply goods and services in Utah, and/or they have caused injury within Utah to a company headquartered in Utah.

## GENERAL ALLEGATIONS

37.    Fusion-io is a privately-held company that was founded in or about June 2006. Fusion-io is a leading provider of enterprise solid-state storage technology and high-performance input/output ("I/O") solutions that enable computer systems to access vast amounts of data at extremely quick rates.    Fusion-io's solid state drives give customers greatly enhanced performance at a fraction of the cost of traditional disk-based storage systems.

### Fusion-io's Business

38.    An SSS device is a device that stores data for a computer system. A typical SSS device is a collection of NAND flash chips combined with a controller and interface. Flash chips are commonly used in digital cameras, iPhones, and USB drives – they are, for example, the storage device on which pictures are stored in the camera. In conceptual terms, an SSS device is what you would get by taking the flash chips out of dozens (or even hundreds) of digital cameras and tying them all together.

11

39.    SSS devices can be used in any computer system, but — due to the cost — they are used more frequently in servers than personal computers. Although Fusion-io also produces high-end consumer level SSS devices, its focus is on enterprise-based solutions for entities with a need to access stored information at a high rate of speed, including entities such as the U.S. military and Fortune 500 companies.

40.    SSS devices bridge a gap in performance that exists in traditional computer systems when data is transferred between the data storage device and the computer's memory. In a traditional computer system, data (such as pictures, music, or computer programs) is stored on a mechanical hard disk. Even with improvements in speed, advancements in this technology (which is more than fifty years old) have not kept pace with improvements to the processing power of computers: modern computers can process information at a significantly higher speed than they can obtain it from a mechanical hard disk.

41.    An SSS device solves the problem created by the slow access speed of the mechanical hard disk. Fusion-io's SSS products achieve much higher rates of data transfer than traditional devices. The result is that Fusion-io's SSS solutions store massive amounts of data and transfer that data at near-memory speeds, with 100 times the capacity density of DRAM and 10 times the capacity per dollar of DRAM.

42.    The market opportunity for SSS technology is enormous. Although there are other providers of SSS devices, Fusion-io has used unique and proprietary designs and architecture to produce a product that writes (i.e., stores data) as rapidly and efficiently as it reads (i.e., accesses data). The products of Fusion-io's competitors write significantly slower than they read. Customers from around the world have described Fusion-io's technology, in

12

particular, as "Game Changing." That is the result of a significant investment of time and money by Fusion-io in developing new technologies. To create these technologies, Fusion-io has not only designed new hardware products but also employs numerous software programmers in drafting proprietary computer code that enables Fusion-io to get the best possible performance from its products.

43.    Fusion-io's business focuses on creating SSS devices and incorporating them into enterprise-based business solutions for public and private business customers, such as Network Attached Storage ("NAS") or Storage Array Network ("SAN") systems. Fusion-io's customer base has grown to include hundreds of large, institutional customers. In addition to military customers, Fusion-io has sales arrangements with leading computer manufacturers including I.B.M., Dell, and Hewlett-Packard. As a result of a significant monetary investment and the efforts of highly-skilled and experienced employees, Fusion-io has quickly become a market leader in the highly specialized area of enterprise SSS solutions.

### Violin's Hiring Of Fusion-io's CEO And Salespeople And Subsequent Solicitation Of Fusion-io Customers

44.    Until his employment was terminated for cause on February 23, 2009, Don Basile was Fusion-io's CEO and Chairman. Up until then, Don Basile's only apparent knowledge of Violin was that it was a competitor of Fusion-io that appeared to be dying. On the morning of February 24, 2009, however, Basile contacted Violin to offer his services – and an opportunity to gain access to Fusion-io's confidential information. Violin – increasingly being perceived by investors, customers, and itself as stuck in a stagnant industry with little prospect for growth – saw Basile and the Fusion-io confidential information he offered as an opportunity to break free from its outdated business model.

13

45.    In or about March 2009, Jeff Newman ("Newman"), who is now a Violin board member, explained to potential investors that Basile had "repositioned" Violin as a "Network Attached Solid State System company," rather than being an "old DRAM vendor." This repositioning was nothing more than a replication of Fusion-io's business model and product line. Newman also lamented that customers were closing their doors to Violin, and he even suggested changing Violin's name to get away from perceptions that Violin was simply an "old DRAM dinosaur."

46.    Immediately after Don Basile's employment with Fusion-io ended, Violin arranged for Basile to visit its headquarters in New Jersey to discuss Violin's business and how Basile could help Violin improve its development into a network attached SSS company. Don Basile could provide this information only because of his employment as CEO of Fusion-io. Don Basile would have known nothing about the SSS business otherwise, as he had never before worked for a company engaged in the SSS technology business.

47.    Don Basile attended this meeting with Violin the following week and, upon information and belief, began performing consulting services shortly thereafter, while he negotiated the terms of his employment with Violin. During the time Don Basile was negotiating with Violin for employment and providing Violin with suggestions on improving its competitiveness, he was still in possession of Fusion-io's confidential and proprietary information on his personal computer(s). This was because while he was CEO of Fusion-io, Don Basile had transferred all of his Fusion-io e-mails as CEO to his personal laptop computer and purposely caused all of those e-mails not to be stored on Fusion-io's servers, even though they are the property of Fusion-io. As a result, Don Basile alone – not Fusion-io – had access to

14

(among other things) all of the communications between Fusion-io's CEO and Fusion-io's customers, vendors and actual and prospective investors. Indeed, during the weeks after his termination of employment while he was consulting with Violin and negotiating his employment as CEO, Basile reviewed and selectively deleted emails and documents he had received as Fusion-io's CEO. To this day, Basile has retained communications that he sent and received as Fusion-io's CEO.

48.    While negotiating his employment and providing advisory services to Violin, Don Basile was also soliciting and receiving Fusion-io confidential information on a continuing basis from certain Fusion-io employees. While he was still CEO of Fusion-io, Don Basile promoted Jodee Lemon ("Lemon"), a 22-year old administrative assistant who was having an undisclosed romantic relationship with Basile, to the position of Manager of Corporate Development. Lemon continued to be employed by Fusion-io for a short time after Don Basile's termination. During this time, Lemon unnecessarily accessed Fusion-io's Salesforce.com account, which is a service paid for by Fusion-io to assist its sales associates in servicing Fusion-io customers. Upon information and belief, Lemon provided Don Basile with the confidential information that was contained on the Salesforce.com account database.

49.    During the same timeframe, Violin also interfered with Fusion-io's relationship with Catalyst. While Catalyst was still under contract to solicit customers, potential advisory board members, and contacts for Fusion-io, Violin solicited the exact same services from Catalyst at Don Basile's direction. Catalyst began providing these services to Violin, thereby breaching its contract to provide such services exclusively to Fusion-io. The contract between Catalyst and Fusion-io prohibits Catalyst from serving as an advisor to a competitor of Fusion-io

during the term of the contract. Catalyst did not honor this obligation, and Violin interfered with Fusion-io's economic relationship with Catalyst.

50.    Lemon and Matt Barletta ("Barletta"), another former Fusion-io employee, all became employed by Catalyst at Don Basile's direction. In or about March 2009, Violin retained Catalyst at Don Basile's suggestion as a way to evaluate opportunities for Violin to improve its competitiveness.

51.    Among the services that Don Basile immediately began providing to Violin were the identification of financing partners and advisory board members. These were the same activities that Don Basile and Catalyst were engaged in on behalf of Fusion-io immediately prior to Don Basile's termination from Fusion-io. Don Basile even identified some of the same advisory board member candidates for Violin that he had previously identified for Fusion-io, including Steve Yatko, Stephen O'Donnell, Ken Venner and Bert Nordberg.

52.    Don Basile officially became Violin's Chief Executive Officer on or before April 15, 2009. Both Don Basile and Violin actively sought to conceal Don Basile's appointment as Violin's Chief Executive Officer for approximately five months. Violin and its Board of Directors took efforts to prevent knowledge of Don Basile's new position from spreading outside the company. Violin did not even issue a press release or make a public announcement that Basile had become its CEO until the first business day after Fusion-io initiated an action against Violin Memory in New Jersey District Court to enforce a subpoena issued in the Utah federal district court action against Basile.. Further serving to conceal Don Basile's involvement with Violin, Iron Capital publicly announced that Don Basile had become a Managing Director of Iron Capital. Notably, at that time, Iron Capital publicly touted its investment in Fusion-io and

16

its recent hiring of Fusion-io's former CEO, while concealing the fact that Iron Capital had made an investment in Violin and that Basile had accepted a position as Violin's CEO.

53.    Shortly after Don Basile became CEO of Violin, Doll joined Violin as well. He is a long-time friend of Don Basile who Don Basile had previously hired to head Fusion-io's sales team. After Doll's employment at Fusion-io was terminated, he signed a Separation Agreement with Fusion-io in which he agreed to maintain the confidentiality of Fusion-io's information and to refrain from disparaging Fusion. Despite this, Doll has joined Don Basile and Violin in exploiting Fusion-io's confidential information and disparaging Fusion-io.

54.    Since hiring Don Basile, Violin has actively recruited numerous other former Fusion-io employees using, upon information and belief, confidential information about the employees that was improperly used and disclosed by Don Basile and Doll. Upon information and belief, Violin recruited some of these individuals while they were still employed by Fusion-io and persuaded them disclose confidential Fusion-io information. From approximately August 2009 through the present, Violin has hired at least four former Fusion-io sales employees and executives that work directly for Don Basile in Violin's new California offices, as well as two other former Fusion-io sales employees in Colorado and Michigan. Four of these former Fusion-io employees and executives were employed in Fusion-io's California offices, which contained approximately 20 employees. These employees include Doll, Barletta, E. Casey Roche III, Kurt Schmidt, Suzanne Riddell, and Donald Milner.

55.    Upon information and belief, these former Fusion-io employees were hired as a means to obtain Fusion-io confidential information including contacts that could be used to solicit Fusion-io's customers. As Violin's CEO, Don Basile has used Fusion-io confidential

information to solicit Fusion-io's customers on behalf of Violin and disparage Fusion-io in the process. Basile and the former Fusion-io employees who now work for Violin have targeted some of Fusion's largest and strategically important customers on behalf of Violin.

56.    For example, in or about December 2009, Don Basile and Doll attended a meeting at a large Fusion-io customer who Don Basile had worked with while at Fusion-io. Don Basile and Doll attempted to convince this large customer to discontinue business with Fusion-io and start business with Violin. Don Basile and Doll falsely represented themselves as the "architects" of Fusion-io and stated that all the key employees of Fusion-io were employed by Violin. They also disparaged Fusion-io's business and products.

57.    Similarly, shortly after Fusion-io entered into a deal with another large customer, Violin contacted the customer in an effort to induce it to terminate its relationship with Fusion-io. Violin revealed that it knew confidential terms of the agreement between Fusion-io and the customer, and sought to provide better terms as an incentive to work with Violin instead.

<u>Violin's Interference With Basile's Agreements With Fusion-io</u>
<u>And Basile's Breach Of Those Agreements As CEO Of Violin</u>

58.    Violin has interfered with both Fusion-io's relationships with its customers and with its contractual agreements with Don Basile. Don Basile joined Fusion-io as a director on or about October 1, 2006 and became its CEO on or about February 1, 2008. As a director CEO of Fusion-io, Don Basile necessarily was at the forefront of every aspect of Fusion-io's business. Don Basile had access to all of Fusion-io's technical data, business plans, pricing information, customer lists, personnel information, engineering costs and sales information. Don Basile obtained that information because of the position of trust he held with Fusion-io as a director and as its highest-ranking officer and, as such, he had a duty to use that information only for Fusion-

io's benefit. Don Basile holds a Ph.D. in electrical engineering from Stanford University and, accordingly, Don Basile understands the technology behind Fusion-io's products. And as CEO, Don Basile was intimately familiar with the business side of the Company as well, including Fusion-io's customer relationships. Indeed, Basile was one of the primary Fusion-io executives to meet with prospective and actual customers to explain the "Game Changing" significance of Fusion-io's cutting-edge SSS technology.

59.    Don Basile and Fusion-io entered into an Amended and Restated Employment Agreement as of December 31, 2008 (a copy of which is attached to this Complaint as Exhibit A) (the "Employment Agreement"). The Employment Agreement provided protections for the company's Confidential Information and prohibits Basile from disparaging Fusion-io during the 12-month period following the termination of his employment with Fusion-io. The Employment Agreement contains the following provisions that are relevant to this action:

**NONSOLICITATION/NONDISPARAGEMENT.**    In the event of the termination of Executive's employment for any reason, Executive shall not, for a period of twelve (12) months, directly or indirectly:

(a) solicit, induce or encourage any employee of the Company or any of its affiliates or subsidiaries to terminate their employment with the Company or any of its affiliates or subsidiaries;

(b) make any derogatory public statement concerning the financial performance, products, services, the Board or management personnel of the Company or any of its affiliates or subsidiaries, or Executive's employment; or

(c) *use or disclose the Company's Confidential Information to induce, attempt to induce or knowingly encourage any Customer of the Company or any of its affiliates or subsidiaries to divert any business or income from the Company or* any of its affiliates or subsidiaries, or to stop or alter the manner in which they are then doing business with the Company or any of its affiliates or subsidiaries.

(Ex. A at ¶ 10 (emphasis added).)

**PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT.** During the term of this Agreement and at all relevant times

19

thereafter, and as a condition to the receipt of any severance benefits hereunder,
Executive agrees to abide and be bound by the terms of a proprietary information
and invention assignment agreement entered into by the Company and Executive
(the **"Proprietary Information and Assignment Agreement"**).

(Ex. A at ¶ 12.)

60.     Fusion-io and Don Basile entered into a Proprietary Information and Inventions

Assignment Agreement ("PIIA") on or about March 13, 2008 (a copy of which is attached to this

Complaint as Exhibit B). The PIIA states that it is part of the consideration for Don Basile's

employment and is effective as of his first date of employment, February 1, 2008. The PIIA

contains the following provisions that are relevant to this action:

> **Company and Third Party Information.** *I agree that at all times during the*
> *term of my employment and thereafter, to hold in strictest of confidence, and*
> *not to use, except for the benefit of the Company, or to disclose to any person,*
> *firm or corporation without written authorization of the Board of Directors of*
> *the Company, any Confidential Information of the Company.* I understand that
> "Confidential Information" means any Company proprietary information,
> technical data, trade secrets or know-how, including, but not limited to,
> information relating to products, services, software, research, developments,
> technology, hardware configuration information, marketing, finances or other
> business information disclosed to me by the Company either directly or indirectly
> in writing, orally or by drawings or observation of parts or equipment.

(Ex. B at ¶ 2(a) (emphasis added).)

> **RETURNING COMPANY DOCUMENTS.** I agree that, at the time of leaving
> the employ of the Company, I will deliver to the Company (and will not keep in
> my possession, recreate or deliver to anyone else) any and all devices, records,
> data, notes, materials, equipment, other documents or property, or reproductions
> of any aforementioned items developed by me pursuant to my employment with
> the Company or otherwise belonging to the Company, its successors or assigns.

(Ex. B at ¶ 5.)

> **SOLICITATION OF EMPLOYEES OR CUSTOMERS.** For a period of
> twelve (12) months following the date Employee ceases to be employed by the
> Company for any reason, Employee, directly or indirectly, will not: (i) solicit,
> induce, influence or encourage any person to leave employment with the
> Company or its resellers or distributors or (ii) harass or disparage the Company or
> its employees, clients, directors or agents. For a period of twelve (12) months
> following the date Employee ceases to be employed by the Company for any

reason, Employee, directly or indirectly, will not solicit any of the Company's customers or users who were customers or users at any time during Employee's employment with the Company.

(Ex. B at ¶ 6.)

**Survival.** The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee.

(Ex. B at ¶ 11(b).)

61.    While Don Basile was still employed by Fusion-io, he purposefully caused all of his company e-mail to be removed automatically from Fusion-io's servers on an ongoing basis and stored solely on his personal laptop computer. Don Basile remains in possession of electronic and/or physical documents incorporating Fusion-io's proprietary, trade secret information, including but not limited to e-mails Don Basile sent or received during his employment with Fusion-io.

62.    As CEO of Fusion-io, Don Basile had access to all of Fusion-io's confidential information. That information includes, but is not limited to:

(a)    Information regarding Fusion-io technology, products, and intellectual property, including the development of Fusion-io's products, problems Fusion-io had successfully overcome, and Fusion-io's plans for future product development;

(b)    Information regarding Fusion-io's customers, including the identities of Fusion-io's customers, the identities of decision-making employees of Fusion-io's customers, the products and services that Fusion-io's customers have purchased from it, details regarding pricing that such customers have paid for Fusion-io's products and services, details regarding customer support provided by Fusion-io to such customers, the identities of Fusion-io's key customers and financial details of its relationships with

21

them, and other information regarding the nature and duration of Fusion-io's relationships with such customers;

(c)    Information regarding Fusion-io's potential customers, including the identities of Fusion-io's most sought-after potential customers, the identities of employees of Fusion-io's potential customers with whom Fusion-io has had contact, the ~~products and services that Fusion-io has attempted to sell to potential customers, and~~ details regarding pricing terms that Fusion-io has offered to potential customers;

(d)    Information regarding Fusion-io's vendors, including the identities of Fusion-io's vendors, the products that Fusion-io has purchased from vendors, details regarding pricing that Fusion-io has paid to its vendors, and other information regarding the nature and duration of Fusion-io's relationships with vendors;

(e)    Information regarding Fusion-io's investors, including the identities of Fusion-io's investors, the identities of decision-making employees of Fusion-io's investors, the monetary amount that Fusion-io's investors have invested in the Company, the amount of stock that Fusion-io's investors have received, the non-monetary terms to which Fusion-io agreed in connection with the investments, and other information regarding the nature and duration of Fusion-io's relationships with its investors;

(f)    Information regarding Fusion-io's potential investors, including the identities of Fusion-io's potential investors, the identities of employees of Fusion-io's potential investors with whom Fusion-io has had contact, the amount of stock that Fusion-io has attempted to sell to potential investors, the monetary and non-monetary

22

terms Fusion-io has offered to potential investors, and other information regarding the nature and duration of Fusion-io's relationships with potential investors;

(g)     Information regarding Fusion-io's employees and contractors, including the identities and skills of Fusion-io's employees and contractors, the compensation paid to Fusion-io's employees and contractors, and other information regarding the nature and duration of Fusion-io's relationships with employees and contractors;

(h)     Information regarding Fusion-io's advisory Board relationships;

(i)     Information regarding Fusion-io's marketing plans, including its plans for traditional and non-traditional advertising, direct communications with customers and potential customers, plans for marketing in connection with the deployment of future products, and plans for obtaining publicity for Fusion-io's products and services; and

(j)     Information regarding Fusion-io's major Original Equipment Manufacturers ("OEMs") and actual and potential strategic allies, such as computer hardware manufacturers, hardware wholesalers and retailers, and software companies, including the basis, prospects, and terms for strategic partnerships with such companies and the benefits to be achieved from such partnerships, as well as other information regarding Fusion-io's strategic partnerships.

63.     On February 23, 2009, Fusion-io held a meeting of the Board of Directors in which it terminated Don Basile's employment, effective as of the same day. Don Basile was terminated for several reasons that constitute termination for "Cause" under his Employment Agreement.

23

64.     On numerous occasions during the days, weeks, and months following Don Basile's termination, Fusion-io and its counsel requested that Don Basile return the company property in his possession or under his control, including but not limited to all Fusion-io emails, documents and the ioSAN Prototype Card, a new product that Fusion-io was developing at the time of Don Basile's termination. Don Basile never responded to these requests. Between February 23 and approximately March 13, 2009, Fusion-io's counsel had several conversations with Don Basile and his counsel instructing Don Basile to return all Fusion-io property and Confidential Information. During this time, and unbeknownst to Fusion-io, Basile was reviewing and selectively deleting emails and documents he had received as Fusion-io's CEO while actively consulting with Violin in advance of becoming its CEO.

65.     On or about March 17, 2009, Fusion-io received an e-mail indicating that Don Basile might be going to work for Violin, but that this information should be kept secret. The e-mail was sent by Newman to Barletta's Fusion-io e-mail address and to a third party, Steve Lapekas ("Lapekas"). Thus, on or about March 20, 2009, Fusion-io's outside counsel sent a letter to Don Basile reminding him of his obligations under his Employment Agreement and PIIA and requesting that Don Basile return all company property in his possession. Don Basile never responded to this letter.

66.     On or about March 27, 2009, after receiving no response from Don Basile, Fusion-io's outside counsel sent a follow-up letter to Don Basile demanding that he respond to the March 20, 2009, letter and further demanding that Don Basile submit a written acknowledgment that he had complied – and would continue to comply – with his continuing

24

obligations to the company under the Employment Agreement and PIIA. Once again, Basile ignored this letter.

67.    On or about April 1, 2009, Fusion-io and Don Basile engaged in negotiations in an attempt to resolve this matter without the need for litigation. At about the same time, Fusion-io learned of the announcement by Blum and Iron Capital that Don Basile had become a managing director of Iron Capital. In hindsight, the announcement appears to have been an attempt to deflect any indication that Don Basile was working for Violin. Indeed, while Iron Capital publicly touted on its website that it had invested in Fusion-io and had hired Fusion-io's former CEO, Iron Capital concealed the fact that it was simultaneously making an investment in Violin and that its newest Managing Director had become the CEO of its newest portfolio company.

68.    On or about April 16, 2009, Newman sent another e-mail to Don Basile and Barletta. Once again, Newman inadvertently sent the email to Barletta's Fusion-io e-mail address and unwittingly apprised Fusion-io of Basile's duplicitous acts. In the e-mail, Newman explained that he was about to become the Chairman of the Board of Directors of Violin and that Don Basile is the "new CEO." Newman further informed the potential investor that Violin was "repositioned" as a "Network Attached Solid State System company," which he contrasted with its prior business of being an "old DRAM vendor."

69.    On or about May 6, 2009, Fusion-io sent another letter to Don Basile demanding that he respond to the March 20th and March 27th letters and further demanding that Don Basile submit a written acknowledgment that he had complied – and would continue to comply – with his continuing obligations to Fusion-io under the Employment Agreement and PIIA.

70.    Fusion-io also sent letters to Violin, Iron Capital, and Catalyst putting them on notice of the obligations of Basile and other former Fusion-io employees to Fusion-io, particularly their confidentiality responsibilities. Fusion-io sent similar letters to its former employees that joined Violin, including Doll. Violin and its board members, Iron Capital, and Catalyst have actual knowledge of the confidentiality obligations owed to Fusion-io.

71.    Don Basile never complied with the demands of Fusion-io's March 20th, March 27th, and May 6th letters, and he retained all of the Fusion-io property in his possession. Accordingly, Fusion-io brought suit against Don Basile in Utah federal district court, pursuant to the forum-selection clause to which they had agreed in the Employment Agreement. Significantly, Don Basile refused to return any of Fusion-io's property until he was ordered to do so by the Utah federal district court on May 18, 2009. Even then, however, Don Basile only turned over an external hard drive containing a copy of the emails that he had selectively retained, while retaining a copy of Fusion-io's emails and documents for himself on two separate personal laptop computers that he owned.

72.    Making matters worse, Violin allowed Don Basile to continue to use the personal computers containing Fusion-io property in providing services to Violin. With the full knowledge of Violin, Don Basile has retained Fusion-io property, comingled Fusion-io property with Violin property, and provided advice to Violin based on information contained in the comingled property.

73.    On May 19, 2009, the federal district court entered the Stipulated Interim Order. By its own terms, this Order was to stay in effect until a preliminary injunction hearing was held, and the Stipulated Interim Order is still in effect as of the filing of this lawsuit.

74.    The Stipulated Interim Order restricts Don Basile in several important ways. Among other things, it requires that "Basile shall not discuss or otherwise provide services related to Fusion-io to Violin Memory or any other direct competitor of Fusion-io."

75.    The Stipulated Interim Order also prohibits Don Basile from (i) "disclosing or otherwise using Fusion-io's purported confidential and proprietary business and trade secret information"; (ii) "transferring Fusion-io's purported confidential and proprietary business and trade secret information to any person or entity"; (iii) "soliciting any of Fusion-io's customers or users who were customers or users at any time during Basile's employment with Fusion-io"; and (iv) "contacting any current or former employee of Fusion-io."

76.    Don Basile, with help from the defendants in this case, has violated the Stipulated Interim Order multiple times in multiple ways. As discussed throughout this Complaint, Don Basile and the defendants have used Fusion-io's confidential information against Fusion-io, Don Basile has contacted and solicited Fusion-io customers and employees, and Don Basile has provided services related to Fusion-io to Violin.

### Violin's Additional Interference With Fusion-io's Business

77.    Knowing that their acts in stealing Fusion-io's confidential information to gain market share would not go unanswered, Don Basile and Violin took additional steps to gain leverage against Fusion-io that had no other business justification. As a director and CEO of Fusion-io, Don Basile learned that David Flynn ("Flynn") and Rick White ("White"), founders of Fusion-io, previously worked at Realm Systems, Inc. ("Realm"), a technology company that built mobile security devices and went bankrupt in 2006. Rasmussen was a lender who foreclosed on the assets of Realm and eventually transferred them to Inaura. After Flynn had left

27

Realm and founded Fusion-io in or about late 2006, when Fusion-io began to experience success, Rasmussen expressed a belief that Realm trade secrets might be incorporated within certain Fusion-io intellectual property.

78.    Inspection of Realm's claimed intellectual property reveals that none of it is incorporated in or forms the basis of Fusion-io's intellectual property. The actions of Realm and its successor, Inaura, over the years have demonstrated as much. Neither company has ever asserted any claims against Fusion-io. Upon information and belief, representatives of Realm and/or Inaura had the potential claims analyzed by intellectual property lawyers and were told their claims had no merit. Moreover, Realm had previously entered into a Settlement and Release Agreement in December 2006 in which Realm voluntarily relinquished any potential claims it had against David Flynn, the inventor of Fusion-io's technology, and Fusion-io. Realm also sold to Fusion-io certain computer equipment and other physical assets.

79.    Fusion-io decided early in its existence to develop technology distinct from that described in provisional Realm patents, which were abandoned and subsequently expired. When Fusion-io's founders departed from Realm, it was an imploding company on the verge of bankruptcy. Realm had undeveloped, early stage plans to build a blade-server system, which is not the model Fusion-io chose to follow. Realm never had any software or firmware.

80.    While Don Basile was Chairman of Fusion-io, he learned of Rasmussen's inquiries in or about the fall of 2006. Upon information and belief, in his capacity as Fusion-io director, Don Basile approached Rasmussen, the secured creditor of Realm, and offered to purchase Realm's intellectual property that was of no interest to Realm's primary business and was about to expire anyway. Upon information and belief, Don Basile was only interested in the

filings dates of Realm's provisional patents, which subsequently expired. Basile did not appear to have urgency to reach a deal with Realm, given the lack of merit to the potential claims. Such an agreement was never reached, and Don Basile proceeded to market Fusion-io and its products throughout his tenure as CEO without ever once calling into question the legitimacy of Fusion-io's intellectual property ownership. In fact, Don Basile affirmatively stated on many occasions that Fusion-io legitimately owned its intellectual property. Don Basile signed binding documents with third parties in which he represented and warranted that he had personal knowledge that Fusion-io properly owned its intellectual property.

81.    Nonetheless, within days after Don Basile's termination for cause by Fusion-io, he approached Inaura – Realm's successor – through Rasmussen and Anderer in an attempt to initiate a dispute between Fusion-io and Inaura. Don Basile only knew to think about approaching Rasmussen and Inaura based on confidential information he gained at Fusion-io that he had no right to use against Fusion-io or to disclose to third parties, including but not limited to Chris Basile and Violin.

82.    Don Basile stated to Rasmussen, Anderer, and Inaura that based on his knowledge of Fusion-io's patents and technology, he believed Inaura had potential claims against Fusion-io notwithstanding the prior Settlement and Release Agreement. This was a clear violation of Don Basile's confidentiality obligations under both his contracts and, as of May 18, 2009, the Stipulated Interim Order. Moreover, it was particularly surprising because Don Basile had headed Fusion-io while its patents and technology were developed without raising concerns about the ownership of Fusion-io's intellectual property. Indeed, while at Fusion-io, Don Basile

29

made numerous written assurances to Fusion-io's customers and investors that Fusion-io's

technology was valuable, legitimate, legal and completely owned by Fusion-io.

83.    Don Basile offered to enter into a Non-Disclosure Agreement with Inaura that

purportedly would allow Don Basile to review Inaura's intellectual property portfolio and

evaluate the strength of any claims against Fusion-io. Rasmussen agreed, and Don Basile was

provided access to Inaura's intellectual property portfolio, which he evaluated against his

knowledge of Fusion-io's intellectual property portfolio. Although Don Basile is not an attorney

(let alone an intellectual property attorney), he advised Rasmussen that his review suggested that

Inaura had viable intellectual property claims against Fusion-io. Don Basile offered to provide

financing if Inaura would institute litigation against Fusion-io, but Inaura did not accept his offer.

84.    After failing at his first attempt to stir up baseless litigation regarding Fusion-io's

intellectual property, Don Basile tried a different tack. Now acting as Violin's CEO, Don Basile

improperly shared Fusion-io confidential information regarding Fusion-io's intellectual property

with Violin and Chris Basile, Don's brother who is an attorney. Don Basile enlisted the

assistance of Violin and Chris Basile to try a new approach to create problems for Fusion-io.

Instead of funding litigation, Chris Basile and Violin would attempt to purchase and/or license

the rights to institute their own litigation.

85.    Don Basile, Chris Basile, and Violin approached Rasmussen, Anderer, and Inaura

in October 2009 seeking to obtain a licensing agreement. Upon information and belief, their

only purposes in seeking the licensing agreement were to raise unfounded questions about the

ownership of Fusion-io's intellectual property, undermine investor and customer confidence in

Fusion-io, attempt to slow down Fusion-io's momentum, further Violin's business prospects, and aid in the instigation of a costly and baseless lawsuit against Fusion-io.

86.    Rasmussen and Anderer knew that Don Basile was the former CEO of Fusion-io and owed confidentiality and fiduciary obligations to Fusion-io that barred any communication regarding Fusion-io's intellectual property. Yet they participated in Basile's scheme.

87.    On or about January 22, 2010, the plan of Violin and Basile came to fruition. In a transparent attempt to divert scrutiny, Violin, Inaura, and Chris Basile, or an entity owned or controlled by him, consummated the transaction. Under the agreement, Chris Basile and/or his affiliate agreed to pay Inaura approximately $1 million in cash, in exchange for an exclusive license to use Inaura's intellectual property and pursue any legal claims associated with the intellectual property. In addition, Violin created a new class of preferred stock solely to transfer to Inaura as further consideration for the transaction. The Violin preferred stock is valued at approximately $2 million. In other words, Chris Basile and Violin paid nearly $3 million in exchange for rights to intellectual property that would be of no use to Chris Basile or his affiliate under any normal circumstances.

88.    Upon information and belief, the sole purpose for Chris Basile to acquire the rights to Inaura's blade-server intellectual property is to assist his brother, Don Basile, and Violin in their plan to harm Fusion-io. Chris Basile is conspiring with Don Basile and Violin to harm Fusion-io by spreading falsehoods about the ownership of Fusion-io's intellectual property and, upon information and belief, by planning to institute a meritless and expensive lawsuit against Fusion-io. Rasmussen and Inaura also enabled and participated in the conspiracy and willingly interfered with Fusion-io's economic relations. Chris Basile and Violin are furthering this

31

conspiracy by accepting Fusion-io's confidential and proprietary information from Don Basile and using it against Fusion-io.

89.    Violin has also been intentionally, or with reckless disregard for the truth of falsity of the statements, and maliciously making false statements of fact to Fusion-io's customers and prospective customers regarding Fusion-io's ownership of its patents. Violin is making these misrepresentations with the intent to disparage Fusion-io, hurt its reputation in the market, and interfere with Fusion-io's relationships with its customers, prospective customers, investors, and other parties.

### FIRST CLAIM FOR RELIEF
### MISAPPROPRIATION OF TRADE SECRETS
#### (All Defendants)

90.    Fusion-io repeats and incorporates herein by reference each and every allegation set forth in the paragraphs above, as though fully set forth herein.

91.    Fusion-io goes to great lengths to protect its confidential information. When hired, employees are required to sign a PIIA, in which the employee agrees to hold in strictest confidence all of Fusion-io's confidential information, which includes all of Fusion-io's confidential and proprietary business and trade secret information. Fusion-io's confidential information is only disclosed outside of Fusion-io when necessary, and then only pursuant to strict non-disclosure agreements.

92.    Fusion-io's electronic communications and data are protected from unauthorized third party access (*i.e.*, hacking) by a firewall that prevents unauthorized inbound internet traffic from reaching Fusion-io's computer networks. Fusion-io's employees who have a legitimate

32

need to access Fusion-io's computers, who have signed a PIIA, can access those computers only using a password.

93.   Fusion-io's confidential and proprietary business and trade secret information comprise documents and information that are not generally known to the public or to other persons who can obtain economic value from its disclosure or use.

94.   As explained above, Fusion-io's confidential and proprietary business and trade secret information are the subject of reasonable efforts by Fusion-io to maintain their secrecy, and they derive independent economic value from not being generally known.

95.   All or a portion of the documents and information comprising Fusion-io's confidential and proprietary business and trade secret information constitute "trade secrets" under Utah law.

96.   As the former CEO of Fusion-io, and because of his acts of misappropriation described above, Don Basile has access to Fusion-io's trade secret information. The defendants misappropriated Fusion-io's trade secrets through improper means. Specifically, as alleged above, Fusion-io is informed and believes that the defendants employed improper means to obtain knowledge of Fusion-io's confidential information and subsequently used and/or disclosed this information without the express or implied consent or knowledge of Fusion-io.

97.   Because of the above-alleged acts and conduct of the defendants, Fusion-io has been damaged and has suffered irreparable harm. The amount of this irreparable harm will be difficult to ascertain, leaving Fusion-io without an adequate remedy at law. Indeed, disclosure of Fusion-io's product may allow other businesses to gain a competitive advantage that they would

33

not otherwise be entitled to obtain, which will detrimentally affect Fusion-io's place in the market and its market share.

98.     Fusion-io is also entitled to recover from defendants for the actual damages sustained by Fusion-io as a result of defendants' wrongful acts as described hereinabove in an amount to be determined at trial. The amount of such damages cannot be determined at this time. Fusion-io is further entitled to recover from defendants the gains, profits, advantages, and unjust enrichment that they have obtained as a result of defendants' wrongful acts as described hereinabove in an amount to be determined at trial. Fusion-io is presently unable to ascertain the full extent of these gains, profits, advantages and unjust enrichment.. .  Additionally, the defendants acted willfully, recklessly, and maliciously in violating Fusion-io's rights. Accordingly, Fusion-io is entitled to an award of punitive damages to sanction the defendants.

## SECOND CLAIM FOR RELIEF
## INTENTIONAL INTERFERENCE WITH PRESENTLY EXISTING AND PROSPECTIVE ECONOMIC RELATIONS
### (All Defendants)

99.     Fusion-io repeats and incorporates herein by reference each and every allegation set forth in the paragraphs above, as though fully set forth herein.

100.    Fusion-io entered into contractual relationships with a number of customers for the sale of Fusion-io's products. Further, Fusion-io was in the process of, and continues to negotiate and discuss contractual relationships with a number of customers for the sale of Fusion-io's products. Several of such prospective relationships were reasonably certain to have resulted in actual contracts between Fusion-io and those customers, given the prospective customers' recognition of Fusion-io's superior performing SSS products and price.  The defendants knew or should have known of these contracts and relationships.

34

101.    Fusion-io was also a party to contractual relationships with a number of its former employees, including Don Basile.    The defendants were aware of these contracts and relationships.

102.    On information and belief, as a direct result of the defendants' use and misappropriation of Fusion-io's confidential information and the defendants' misrepresentations, customers which had contracted with Fusion-io terminated their contractual relationships in order to conduct business with Violin.

103.    On information and belief, as a direct result of the defendants' use and misappropriation of Fusion-io's confidential information and the defendants' misrepresentations, customers who had reasonable probabilities of entering into contractual relationships with Fusion-io did not enter into contractual relationships with Fusion-io.

104.    On information and belief, as a direct result of the defendants' conduct, former Fusion-io employees, including Don Basile, who had continuing contractual obligations to Fusion-io breached those obligations for the benefit of the defendants.

105.    The result of such conduct was foreseeable, and occurred directly as a result of the defendants' improper means and improper purposes.    The defendants acted unlawfully and without privilege or justification in taking such wrongful action.

106.    Because of the above-alleged acts and conduct of the defendants, Fusion-io has been damaged and has suffered substantial and irreparable harm.    The amount of this irreparable harm will be difficult to ascertain, leaving Fusion-io without an adequate remedy at law.    Indeed, use of Fusion-io's confidential information and disparaging misrepresentations may allow other

businesses to gain a competitive advantage that they would not otherwise be entitled to obtain, which will detrimentally affect Fusion-io's place in the market and its market share.

107.    Fusion-io is also entitled to recover from defendants for the actual damages sustained by Fusion-io as a result of defendants' wrongful acts as described hereinabove in an amount to be determined at trial. The amount of such damages cannot be determined at this time. Fusion-io is further entitled to recover from defendants the gains, profits, advantages, and unjust enrichment that they have obtained as a result of defendants' wrongful acts as described hereinabove in an amount to be determined at trial. Fusion-io is presently unable to ascertain the full extent of these gains, profits, advantages and unjust enrichment. Additionally, the defendants acted willfully, recklessly, and maliciously in violating Fusion-io's rights. Accordingly, Fusion-io is entitled to an award of punitive damages to sanction the defendants.

### THIRD CLAIM FOR RELIEF
### CIVIL CONSPIRACY
#### (All Defendants)

108.    Fusion-io repeats and incorporates herein by reference each and every allegation set forth in the paragraphs above, as though fully set forth herein.

109.    The defendants entered into a conspiracy with Don Basile to harm Fusion-io. The defendants reached a meeting of the minds to institute a "scorched earth" policy intended to accomplish the object of damaging Fusion-io in various ways, including spreading falsehoods about Fusion-io's intellectual property, misusing Fusion-io's confidential information, soliciting Fusion-io's customers, and targeting Fusion-io's employees.

110.    Don Basile took the unlawful overt act in the furtherance of the conspiracy of breaching his contractual obligations and a federal court order regarding the use and disclosure

36

of Fusion-io's confidential information. The defendants took the unlawful overt acts of misappropriating Fusion-io's trade secrets, tortiously interfering with Fusion-io's economic relations, and otherwise assisting Don Basile in his unlawful behavior. The defendants took these actions despite being on notice of Don Basile's confidentiality obligations to Fusion-io.

111.    Because of the above-alleged acts and conduct of the defendants, Fusion-io has been damaged and has suffered substantial and irreparable harm. The amount of this irreparable harm will be difficult to ascertain, leaving Fusion-io without an adequate remedy at law. Indeed, use of Fusion-io's confidential information and disparaging misrepresentations may allow other businesses to gain a competitive advantage that they would not otherwise be entitled to obtain, which will detrimentally affect Fusion-io's place in the market and its market share.

112.    Fusion-io is also entitled to recover from defendants for the actual damages sustained by Fusion-io as a result of defendants' wrongful acts as described hereinabove in an amount to be determined at trial. The amount of such damages cannot be determined at this time. Fusion-io is further entitled to recover from defendants the gains, profits, advantages, and unjust enrichment that they have obtained as a result of defendants' wrongful acts as described hereinabove in an amount to be determined at trial. Fusion-io is presently unable to ascertain the full extent of these gains, profits, advantages and unjust enrichment. Additionally, the defendants acted willfully, recklessly, and maliciously in violating Fusion-io's rights. Accordingly, Fusion-io is entitled to an award of punitive damages to sanction the defendants.

## FOURTH CLAIM FOR RELIEF
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY/DUTY OF LOYALTY
### (All Defendants)

113.    Fusion-io repeats and incorporates herein by reference each and every allegation set forth in the paragraphs above, as though fully set forth herein.

114.    By virtue of his employment with Fusion-io, Don Basile and other former Fusion-io employees owed a duty of loyalty to Fusion-io.

115.    Additionally, as a high-ranking executive, Don Basile owed a fiduciary duty to Fusion-io.

116.    Don Basile and other former Fusion-io employees willfully and intentionally breached these duties by retaining and using Fusion-io's confidential information on behalf of Violin and Inaura.

117.    The defendants took affirmative steps to aid Don Basile and the other Fusion-io employees in their breaches of fiduciary duty and duty of loyalty, as described above. They took these steps despite being on notice of Don Basile's confidentiality obligations to Fusion-io.

118.    The defendants acted willfully, recklessly, and maliciously in violating Fusion-io's rights and should be sanctioned by punitive damages.

119.    Fusion-io is also entitled to recover from defendants for the actual damages sustained by Fusion-io as a result of defendants' wrongful acts as described hereinabove in an amount to be determined at trial. The amount of such damages cannot be determined at this time. Fusion-io is further entitled to recover from defendants the gains, profits, advantages, and unjust enrichment that they have obtained as a result of defendants' wrongful acts as described hereinabove in an amount to be determined at trial. Fusion-io is presently unable to ascertain the

38

full extent of these gains, profits, advantages and unjust enrichment. Additionally, the defendants acted willfully, recklessly, and maliciously in violating Fusion-io's rights. Accordingly, Fusion-io is entitled to an award of punitive damages to sanction the defendants.

### FIFTH CLAIM FOR RELIEF
### CONVERSION
(Violin)

120.    Fusion-io alleges again each and every allegation set forth in the paragraphs above, and incorporates them herein by reference.

121.    Fusion-io owns the confidential information contained on Don Basile's laptop computer and in the e-mails diverted from Don Basile's Fusion-io email account to his personal email account. Fusion-io also owns the ioSAN prototype card that Don Basile removed from the company and has refused to return to the company since his termination. Upon information and belief, Don Basile wrongfully acquired all or a portion of Fusion-io's confidential information.

122.    With the full knowledge of Violin, Don Basile has wrongfully retained Fusion-io property and confidential information, comingled Fusion-io property with Violin property, and used such property and confidential information in his capacity as a consultant of Violin since on or about February 24, 2009 and as CEO of Violin since, at a minimum, April 15, 2009. Accordingly, Violin is directly and vicariously liable for Don Basile's conversion of Fusion-io's confidential information and property.

123.    Fusion-io is entitled to recover from Violin for the actual damages sustained by Fusion-io as a result of Violin's wrongful acts as described hereinabove. The amount of such damages cannot be determined at this time. Fusion-io is further entitled to recover from Violin the gains, profits, advantages, and unjust enrichment that they have obtained as a result of

39

Violin's wrongful acts as described hereinabove. Fusion-io is presently unable to ascertain the full extent of these gains, profits, advantages and unjust enrichment. Additionally, Violin acted willfully, recklessly, and maliciously in violating Fusion-io's rights. Accordingly, Fusion-io is entitled to an award of punitive damages to sanction Violin.

## SIXTH CLAIM FOR RELIEF
## TRADE LIBEL
### (Violin)

124.    Fusion-io alleges each and every allegation set forth in the paragraphs above, and incorporates each allegation herein by reference.

125.    Upon information and belief, in the course of using Fusion-io's misappropriated confidential information to solicit employees, former employees, partners, customers, vendors, and suppliers, Violin published to these third parties certain statements about Fusion-io, Fusion-io's management, and the intellectual capital of Fusion-io. Some specific examples of such disparagement include, but are not limited to:

a.    The statement that Violin is employing the former Fusion-io employees who were responsible for Fusion-io's success; and

b.    The statement that Violin is employing the former Fusion-io employees who were the architects of Fusion-io's unique and superior technology; and

c.    The statement that Fusion-io did not own the patents to its technology.

126.    Such statements were, at the time, and continue to be, false statements of fact.

127.    Violin was aware of the statements' falsity at the time, and it nonetheless elected to make such statements. In the alternative, Violin entertained serious doubts as to the truthfulness of the statements about Fusion-io and former Fusion-io employees, and nevertheless elected to make such statements.

40

128.    The result of such false statements by Violin was foreseeable, and occurred directly as a result of Violin's intentional and malicious actions done with ill will for the purpose of gaining an unfair advantage over Fusion-io and harming Fusion-io's market share. The evidence will show that under such circumstances, Violin acted with malice and without privilege in making such statements.

129.    Fusion-io was injured and suffered special damages as a result of such statements and conduct. Fusion-io suffered (i) a loss of reasonably foreseeable net profits, (ii) lost goodwill from prospective purchasers, and (iii) lost standing and suffered discouragement of prospective purchasers by being held in disrepute.

130.    Violin acted willfully, recklessly, and maliciously in violating Fusion-io's rights and should be sanctioned by punitive damages.

131.    Because of the above-alleged acts and conduct of Violin, Fusion-io has been damaged and, if Violin is not enjoined, Fusion-io will continue to suffer great and irreparable harm. The amount of this irreparable harm will be difficult to ascertain, leaving Fusion-io without an adequate remedy at law. Indeed, disparagement of Fusion-io may allow other businesses to gain a competitive advantage that they would not otherwise be entitled to obtain, which will detrimentally affect Fusion-io's place in the market and its market share. If that happens, the value of the company will decrease significantly.

## SEVENTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT
### (Violin, Inaura, Chris Basile, John Does 1-10)

132.    Fusion-io alleges each and every allegation set forth in the paragraphs above, and incorporates each allegation herein by reference.

133.    There is a justiciable controversy between Fusion-io and Violin, Inaura, Chris Basile, and John Does 1-10 regarding whether the agreement for Chris Basile or his affiliates to acquire intellectual property rights from Inaura is valid because it came about due to, and is based upon, improper use of Fusion-io's confidential information.

134.    The interests of the parties are adverse, and Fusion-io has a legally protectable interest in preventing the misuse of its confidential information.

135.    The issue is ripe for judicial determination because Violin, Inaura, and Chris Basile or his affiliates have reached an agreement, and Fusion-io soon will have lost the ability to protect the confidential information that was improperly used as the foundation for this unlawful agreement.

136.    Pursuant to Utah Code § 78B-6-401 *et seq.*, Fusion-io is entitled to a judgment declaring that the transaction and contract entered into by Chris Basile and/or his affiliate, Violin, and Inaura for the purchase of Inaura's intellectual property rights is null and void.

## EIGHTH CLAIM FOR RELIEF
## INJUNCTION
### (All Defendants)

42

137.    Fusion-io alleges each and every allegation set forth in the paragraphs above, and incorporates each allegation herein by reference.

138.    Based on the facts and claims set forth above, Fusion-io is entitled temporary and permanent injunctive relief against the defendants.

139.    The actions of the defendants will cause permanent and irreparable harm to Fusion-io that is not adequately compensable by money damages.

140.    As set forth more fully below, Violin, Inaura, and Chris Basile or his affiliates should be enjoined from entering into the transaction whereby Inaura is transferring intellectual property rights to Chris Basile or his affiliates. To the extent the transaction has been consummated, the Court should issue provisional and permanent injunctive relief unwinding the agreement. All defendants should be enjoined from assisting or participating with Chris Basile or his affiliate in any post-closing transfer of the intellectual property rights of Inaura. .

141.    Additionally, the defendants should be enjoined from disclosing or using Fusion-io's confidential information, from transferring Fusion-io's confidential information, from contacting former or current Fusion-io employees, for assisting or encouraging any violation of Basile's continuing duties to Fusion-io, from deleting or destroying any Fusion-io property or information, and from making any disparaging comments about Fusin-io

142.    Additionally, Violin should be enjoined from employing Basile in any fashion.

### NINTH CLAIM FOR RELIEF
### BREACH OF CONTRACT
(Catalyst)

143.    Fusion-io alleges each and every allegation set forth in the paragraphs above, and incorporates each allegation herein by reference.

43

144.    At the direction of Don Basile, Fusion-io and Catalyst entered into a contract in which Fusion-io paid Catalyst exorbitant fees in exchange for Catalyst providing introductions to and meetings with potential customers, advisory board members, and industry partners (the "Catalyst Contract").

145.    Fusion-io performed its obligations under the Catalyst Contract.

146.    One contractual provision obligated Catalyst to refrain from providing services to a competitor of Fusion-io during the term of the contract.

147.    Catalyst breached the Catalyst Contract by providing to Violin the same services it was supposed to exclusively provide to Fusion-io. Indeed, Catalyst has introduced some of the same customers and advisory board members to Violin that it had previously introduced or attempted to introduce to Fusion-io.

148.    As a result of this breach, Fusion-io has suffered damages in an amount that will be proven at trial. Fusion-io paid fees for services it did not receive, and Fusion-io also lost business opportunities that Catalyst had committed to provide.

**TENTH CLAIM FOR RELIEF**
**BREACH OF CONTRACT**
**(Doll)**

149.    Fusion-io alleges each and every allegation set forth in the paragraphs above, and incorporates each allegation herein by reference.

150.    After the termination of his employment at Fusion-io, Doll entered into a Separation Agreement with Fusion-io.

44

151.    The Separation Agreement incorporates Doll's confidentiality obligations from the Proprietary Information and Invention Assignment Agreement that he signed while employed by Fusion-io. The Separation Agreement also contained its own confidentiality obligations and required Doll to refrain from making any disparaging statements about Fusion-io. Doll's compliance with the terms of the Proprietary Information and Invention Assignment Agreement and Separation Agreement were a material condition to Doll receiving the severance benefits under the Separation Agreement.

152.    The Separation Agreement is a valid contract supported by consideration, and Fusion-io fulfilled its obligations under the Separation Agreement.

153.    Doll breached the Separation Agreement by disclosing Fusion-io's confidential information and by making disparaging statements about Fusion-io.

154.    As a result of this breach, Fusion-io has suffered damages in an amount that will be proven at trial.

### PRAYER FOR RELIEF

Fusion-io prays for judgment against the defendants as follows:

1.    For compensatory damages against all defendants in amounts to be proven at trial;

2.    For punitive damages against all defendants in amounts to be proven at trial;

3.    For a judgment declaring that the transaction between Inaura, Violin, and Chris Basile and/or his affiliate is null and void;

4.    For provisional and permanent injunctive relief to prohibit, invalidate, rescind and/or render void any actual or proposed transaction between Inaura, Violin, Chris Basile

and/or any other defendant regarding the transfer of Inaura's intellectual property rights to Violin, Chris Basile, or any other defendant;

     5.     For injunctive relief prohibiting any defendant from assisting or participating with Chris Basile or his affiliate in any post-closing transfer of the intellectual property rights of Inaura

     6.     For a writ of possession and injunctive relief requiring the defendants to return to Fusion-io any and all Fusion-io confidential and proprietary business and trade secret information in their possession, custody or control or that subsequently comes into its possession, custody or control, including the Fusion-io confidential and proprietary business and trade secret information described above, and to account for each and every disclosure, transfer, and/or other use of any part of this information, including an accounting of each and every individual given access to any part of this information and the timing, extent and nature of that access;

     7.     For provisional and permanent injunctive relief, enjoining and restraining defendants from the wrongful acts and conduct set forth above, including an order that all other persons acting in active concert or privity or in participation with them be enjoined:

     (a) from further disclosing or otherwise using Fusion-io's confidential and proprietary business and trade secret information, whether in electronic, hard-copy, or other form, including Fusion-io's confidential and proprietary business and trade secret information described above, (1) by citing, quoting, making notes from, or otherwise using this information in the creation of any material, whether written, recorded or otherwise, or for the purpose of

soliciting Fusion-io's actual or prospective customers, employees, consultants, vendors, and investors; (2) making any copies of such information, whether electronically or by other means; (3) communicating such information to any person or third party; (4) transferring such information to any other storage media, computer, server, facility, or other tangible or intangible thing where such information might be stored; and (5) or any other means; and

(b) from transferring Fusion-io's confidential and proprietary business and trade secret information, whether in electronic, hard-copy, or other form, wrongfully obtained from Fusion-io, including the Fusion-io's confidential and proprietary business and trade secret information; and

(c) from contacting any current or former employee of Fusion-io or from taking any other steps for the purpose of wrongfully obtaining Fusion-io's confidential and proprietary business and trade secret information, including Fusion-io's confidential and proprietary business and trade secret information described above; and

(d) from assisting or encouraging any violation of Basile's continuing duties to Fusion-io under his Employment Agreement and PIIA, including but not limited to his obligations not to solicit Fusion-io employees to terminate their employment with Fusion-io and not to disparage Fusion-io; and

(e) from deleting or destroying any Fusion-io property or confidential information before returning it to Fusion-io; and

47

(f) from disparaging Fusion-io to customers, prospective customers, partners,

investors, vendors, or suppliers.

8.    For preliminary injunctive relief, enjoining and restraining Violin from employing

Basile as Violin's CEO or having Basile perform any services for Violin for a period of twelve

months;

9.    For attorneys' fees and costs of suit herein incurred; and

10.   For such other, further, and/or different relief as the Court may deem just and

proper.

DATED this 28th day of January, 2010.

PARSONS BEHLE & LATIMER

By _____

DAVID M. BENNION
SCOTT S. BELL
Attorneys for Plaintiff Fusion
Multisystems, Inc. d/b/a Fusion-io


Plaintiff's Address:

6350 South 3000 East 6th Floor
Salt Lake City, UT 84121